[No. H021925. Sixth Dist. Oct. 15, 2002.]

In re the Marriage of VERNON A. and CARMENCITA J. NORVIEL.
VERNON A. NORVIEL, Respondent, v.
CARMENCITA J. NORVIEL, Appellant.

**Counsel**

Fancher & Wickland, Paige Leslie Wickland; Chung & Romano and Susan M. Chung for Appellant.

Dok, Levy & Perrin, William L. Dok; Bien & Summers and E. Elizabeth Summers for Respondent.

**Opinion**

**WUNDERLICH, J.**—This appeal arises from bifurcated proceedings in a marital dissolution action. The question before us is whether the trial court erred in determining the parties' date of separation. In particular, we must consider what it means for spouses to live separate and apart.

The trial court determined that the parties separated in June 1998, when the husband stated his intention to end the marriage. The wife challenges that determination. She asserts that there was no conduct demonstrating a final break in the marriage until many weeks later. Among other things, she

cites undisputed evidence that the parties continued to reside together until August 1998 and that they continued to maintain joint finances until September 1998.

We conclude that the trial court incorrectly applied the law in this case. We therefore reverse the order determining the date of separation.

### FACTS

Vernon A. Norviel (Husband), petitioner below, is the respondent here. Carmencita J. Norviel (Wife), respondent below, is the appellant here.

Husband and Wife were married in 1983. They have two children: a son born in 1986, and a daughter born in 1994.

The marriage had "always been somewhat difficult" and the parties had discussed divorce repeatedly over the years. Both parties worked long hours and traveled frequently. After the birth of their daughter in 1994, Wife stopped sleeping with Husband on a regular basis, and instead usually slept in the daughter's room. As Husband described it, he and Wife were "roommates." They had few common interests or activities. They occasionally had family dinners together, however. In addition, Husband and Wife tried to have Sunday night dinners alone.

During their Sunday night dinner on June 28, 1998, Husband communicated to Wife his decision that "[t]his was the end of the marriage." After the exchange of some angry words, the parties agreed that Husband would move into a rental house in Santa Clara that they were in the process of buying. After their conversation on June 28, 1998, Husband took steps to prepare the rental house for his occupancy, including having it cleaned, painted, and furnished.

Despite the decision to separate, Husband did not immediately move from the family home in Cupertino, because the Santa Clara rental house was not yet ready. Husband continued to reside in the family home until August 15, 1998, when he moved into the Santa Clara house. During that time, Husband and Wife continued to live as roommates. As before, Husband had his laundry done at the family home, by the maid. He continued to use the mailing address and telephone number of the family home. And he continued to take occasional meals and outings with the family, in an attempt to maintain a civil relationship for the sake of the children.

Soon after the decision to separate, in July 1998, Husband and Wife took a long-planned family vacation to Canada. During the trip, Husband and

Wife did not sleep together nor did they discuss reconciliation. That same month, Husband took a business trip to Belgium and London. He invited Wife to join him there, without the children, but she declined. The parties' 15th wedding anniversary also fell in July 1998, and Husband sent Wife flowers accompanied by a card.

For some months after the decision to separate, Husband and Wife maintained their finances jointly. They kept and used joint bank and credit card accounts until September 1998. During that time, both parties continued to have their paychecks deposited into their joint checking account. In addition, the parties deposited more than $71,000 in stock sale proceeds into the joint account on August 13, 1998. The parties continued to pay all their expenses from the joint account until September 1998. There were several other significant financial transactions involving Husband and Wife between June and September 1998. In July 1998, the parties closed escrow on the Santa Clara rental house, using community property funds for the purchase and taking joint tenancy title as husband and wife. Also, sometime in July 1998, the parties discussed property division. In August 1998, Husband completed a 1997 stock gift to Wife's nieces and nephews. Finally, in September 1998, Husband established his own separate bank and credit card accounts.

## PROCEDURAL HISTORY

On September 15, 1998, Husband filed this action for dissolution of the marriage. In his petition, Husband identified June 21, 1998, as the date of separation. In her initial response, Wife set the date of separation at August 15, 1998. Thereafter, the parties stipulated to June 21, 1998, as the date of separation, in order to facilitate the filing of income tax returns. Wife later moved to set aside that stipulation. That motion was resolved by a second stipulation, in which the parties agreed to set aside the first stipulation. They also agreed to bifurcate the disputed question of their separation date and to try that issue first.

The issue of the parties' separation date was tried on March 30, 2000. At trial, Husband contended that the parties separated on June 28, 1998. Wife claimed that the date of separation was September 15, 1998. The court heard the testimony of Husband, Wife, and three other witnesses, admitted documentary evidence, and entertained written argument in the form of the parties' trial briefs. At the conclusion of the one-day trial, the court took the matter under submission.

Several days later, in early April 2000, the court issued its "proposed" statement of decision. Having been granted an extension of time to object,

Wife filed objections to the statement and a request for clarifications in May 2000. In August 2000, the court filed its statement of decision, which was substantially similar to its proposed decision. The court thereafter entered an order pursuant to its statement of decision.

In August 2000, the trial court certified its order for immediate appeal. Wife then moved this court for review of the trial court's order. We granted Wife's motion in September 2000.

## APPEALABILITY

■ Even though it fails to dispose of all issues in this case, the order determining the date of separation nevertheless is appealable. (Code Civ. Proc., § 904.1, subd. (a)(10); Fam. Code, § 2025; Cal. Rules of Court, rule 1269.5.)

## STANDARD OF REVIEW

The parties dispute the appropriate standard of review. Wife argues for independent review, claiming that the essential facts concerning the date of separation are undisputed. (See, e.g., *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 736 [28 Cal.Rptr.2d 447] [on undisputed facts, date of separation presents question of law].) Husband vigorously contends for substantial evidence review. (See, e.g., *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 435 [181 Cal.Rptr. 910] [trial court's finding of separation date supported by substantial evidence].) According to Husband, the trial court resolved conflicts in the evidence, including a determination of the parties' subjective intent, which always presents a question of fact. Husband further asserts that even if the facts were undisputed, substantial evidence review is required because of the rule of conflicting inferences.

■ "Questions of fact concern the establishment of historical or physical facts; their resolution is reviewed under the substantial-evidence test." (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) Questions of law, such as the selection of a rule or the interpretation of a statute, are reviewed independently. (*Ibid.*; see also *Estate of Joseph* (1998) 17 Cal.4th 203, 216-217 [70 Cal.Rptr.2d 619, 949 P.2d 472] [statutory interpretation].) Where mixed questions of fact and law require "a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]" (*Crocker National Bank v. City and County of San Francisco, supra,* 49 Cal.3d at p. 888; cf. *In re Marriage of Dekker* (1993) 17 Cal.App.4th 842, 849, fn. 11 [21 Cal.Rptr.2d 642].)

In this case, we review the trial court's determination of disputed facts for substantial evidence. But we independently review the trial court's application of the governing law.

## DISCUSSION

■■■ The sole issue on appeal is whether the trial court properly determined the date of separation.

The significance of the determination lies in the fact that it dictates the character of property acquired thereafter. (See, e.g., *In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1491 [61 Cal.Rptr.2d 493]; *In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 451 [45 Cal.Rptr.2d 308].) A spouse's "earnings and accumulations . . . while living separate and apart from the other spouse" are separate property. (Fam. Code, § 771, subd. (a).)[1] In this case, the economic consequences of the determination are substantial, even though the period between the disputed dates is relatively short: Between the end of June and the middle of September 1998, Husband earned stock options worth a considerable sum.

.Despite the importance of the determination, "the Legislature has neither defined 'date of separation' nor specified a standard for determining it. The only statutory reference to this term is found in Family Code section 771[,] which provides: 'The earnings and accumulations of a spouse, . . . while living separate and apart from the other spouse, are the separate property of the spouse.'" (*In re Marriage of Hardin, supra,* 38 Cal.App.4th at pp. 450-451, fn. omitted; see also 1 Cal. Civil Practice: Family Law Litigation (1993) Character and Valuation of Property, § 5:21, p. 22.) The phrase "living separate and apart" *is itself* "a term of art." (1 Kirkland et al., Cal. Family Law: Practice and Procedure (2d ed. 2002) Characterization—Division in General, § 20.06[2][a], p. 20-21.) As developed through case law, " 'living separate and apart' . . . means that the parties' *physical separation* is the result of a breakdown in the marital relationship." (*Ibid.,* italics added.)

■■■ Drawing from the relevant judicial decisions, two factors emerge as prerequisites to separation. First, at least one spouse must entertain the subjective intent to end the marriage; second, there must be objective evidence of conduct furthering that intent. (See, e.g., *In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 451; *In re Marriage of von der Nuell,*

---

[1]Family Code section 771, subdivision (a) reads in full as follows: "The earnings and accumulations of a spouse and the minor children living with, or in the custody of, the spouse, while living separate and apart from the other spouse, are the separate property of the spouse."

*supra,* 23 Cal.App.4th at p. 736; see generally Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2002) ¶ 8:111.2, p. 8-34; 1 Cal. Civil Practice: Family Law Litigation, *supra,* Character and Valuation of Property, § 5:21, p. 22.) "Simply stated, the date of separation occurs when either of the parties *does not* intend to resume the marriage *and* his or her actions bespeak the finality of the marital relationship." (*In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 451, original italics.) We examine the evidence of each of the two factors in this case.

### I.  *Intent*

As noted above, the first prerequisite to separation is subjective intent. "All factors bearing on either party's intentions 'to return or not to return to the other spouse' are to be considered. [Citation.]" (*In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 452.) "The ultimate test is the parties' subjective intent and all evidence relating to it is to be objectively considered by the court." (*Ibid.*)

In this case, the trial court found that Husband intended to finally end the marriage—and that he communicated that intent to Wife—on June 28, 1998. That finding is amply supported by Husband's trial testimony. Wife does not seriously contend otherwise.

### II.  *Conduct*

The real dispute in this case is "whether the parties' conduct evidences a complete and final break in the marital relationship." (*In re Marriage of Baragry* (1977) 73 Cal.App.3d 444, 448 [140 Cal.Rptr. 779].) Without such conduct, there can be no finding of separation. (*Ibid.*; accord, *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 736 [trial court's "exclusive focus" on intent was erroneous].)

In the context of this proceeding, the parties' dispute over conduct has two elements, timing and evidence.

#### A.  *Timing*

The first element of the parties' dispute over conduct has to do with timing.

According to Wife, the statute requires "present intent to separate *combined with* conduct evidencing a complete and final break in the marital relationship. When the intent and conduct do not occur simultaneously, the

date of separation does not exist until the second of the two factors occurs." (Original italics.) In the same vein, Wife also asserts that "no case has ever held that the first—rather than the last—in a series of steps leading toward an eventual separation establishes the date of final separation."

Husband views the timing issue somewhat differently. ██ As Husband correctly observes, the trial court—which is required to weigh an earlier separation date proffered by one party against a later date proffered by the other party—must examine the parties' conduct during the entire disputed time. (See, e.g., *In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 453.) But that examination must focus on conduct that is contemporaneous with and demonstrative of the necessary subjective intent. Later conduct that is merely consistent with an earlier decision to separate does not support an earlier separation date.

In our view, then, separation cannot occur until intent and conduct are present simultaneously.

## B. *Evidence of the Requisite Conduct*

██ The second element of the parties' dispute is whether the conduct shown by this record is sufficiently probative of the chosen separation date. We examine the evidence of that conduct now.

### 1. *Communication of Intent*

We first consider whether the act of communicating intent is sufficient conduct, in and of itself, to support a finding of separation. Husband contends that it is. Wife disagrees. Asserting that verbal statements do not constitute conduct except in "the most technical sense" of the word, she contends that more is required.

In this context, we agree with Wife that "actions speak louder than words." The cases recognize as much. (See, e.g., *In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 453 ["The best evidence of [the parties' intent] is *their words and actions*." (Original italics, underscoring added.)].)

We therefore turn to a consideration of whether the record demonstrates other conduct sufficient to support the court's determination that the parties separated on June 28, 1998.

### 2. *Other Conduct*

Husband proffers two contemporaneous actions that he claims are consistent with a separation date of June 28th. First, Husband testified that he

discussed divorce with the couple's son that same night. Second, Husband and Wife ceased having Sunday night dinners together after June 28th.

Against that conduct, Wife points to undisputed evidence that the parties thereafter maintained financial and social connections. The parties' continuing financial ties after June 28th included joint bank accounts, joint credit cards, and joint real property acquisition as husband and wife. (Cf. *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 736 [no separation where "the parties maintained joint checking accounts, credit cards, and tax returns, and took title to an automobile jointly" and husband "continued to contribute financially to the community"]; see also *In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 454 [no separation where the parties' "economic relationship remained unchanged and they acquired real property together"].) The parties' social connections after June 28th included a family vacation, occasional family meals and outings, and Husband's remembrance of the couple's anniversary. (Cf. *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 736 [no separation where husband "took wife on vacations, they went out socially, sent cards and gifts on special occasions and holidays, and continued having sexual relations"]; see also *In re Marriage of Baragry, supra,* 73 Cal.App.3d at p. 447 [no separation where husband took "wife to Sun Valley for a week without the children. He frequently took wife to social occasions—parties at friends' homes, dinners for professional and academic groups, outings with other doctors and their wives. He sent wife numerous Christmas, birthday, and anniversary cards"].)

As a reviewing court, it is not our place to reweigh the evidence. (See, e.g., *Garfein v. Garfein* (1971) 16 Cal.App.3d 155, 158 [93 Cal.Rptr. 714]; but see, e.g., *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 736 [on undisputed facts, appellate court undertakes de novo review].)

Nevertheless, for reasons we explain below, we conclude as a matter of law that the evidence here is insufficient to establish June 28, 1998, as the date of separation.

### 3.  *Living Apart*

Separation does not occur unless the parties are "living separate and apart." (Fam. Code, § 771, subd. (a).) In this case, we are called upon to decide whether a married couple can be "living separate and apart" within the meaning of the statute when they continue to reside together in the same house.

The statutory phrase "living separate and apart" has been the subject of only a handful of published opinions in this state.  ■   As those decisions

recognize, the fact that "husband and wife may live in separate residences is not determinative." (*In re Marriage of Baragry, supra,* 73 Cal.App.3d at p. 448, citing *Makeig v. United Security Bk. & T. Co.* (1931) 112 Cal.App. 138, 144 [296 P. 673], and *Tobin v. Galvin* (1874) 49 Cal. 34; see also *In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 453; *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 737; *In re Marriage of Marsden, supra,* 130 Cal.App.3d at p. 434.) But in each of those cases, the court concluded that the parties had *not* separated within the meaning of the statute, *despite* living in separate residences.

■ Decisional law thus clearly establishes that parties may live apart and yet not be separated. The question here is whether the reverse is also true. We conclude it is not. The one case cited by Husband on this point is not to the contrary, so far as we can tell from its sparse recitation of facts. (See *In re Marriage of Johnson* (1982) 134 Cal.App.3d 148, 155 [184 Cal.Rptr. 444].) In that case, the wife testified to a separation date of April 1978, "although her petition showed that the parties were not yet separated by the date of its filing" a year later. (*Ibid.*) The husband "conceded there had been 'no home life, no family life, no nothing . . . for several years.' " (*Ibid.*) Those facts do not give rise to an inference that the parties remained under the same roof after April 1978. For that reason, the case is not authority for the proposition that parties may separate while residing in the same house. Furthermore, quite apart from the lack of authority, we find that proposition untenable.

We conclude that living apart physically is an indispensable threshold requirement to separation, whether or not it is sufficient, by itself, to establish separation.

We find support for that conclusion first in the statutory language itself. Earnings are separate property only when spouses are "living separate and apart." (Fam. Code, § 771, subd. (a).) By at least one creditable definition, "living separate and apart" means "*residing in different places* and having no intention of resuming marital relations." (Black's Law Dict. (7th ed. 1999) p. 945, italics added.)

We also find support for our conclusion in several early decisions of this state, which suggest that physical separation is required. "Living separate and apart . . . applies to a condition where the spouses have come to a parting of the ways and have no present intention of resuming the marital relations and taking up life together *under the same roof.*" (*Makeig v. United Security Bk. & T. Co., supra,* 112 Cal.App. at p. 143, italics added; see also, e.g., *Patillo v. Norris* (1976) 65 Cal.App.3d 209, 214, 218 [135 Cal.Rptr.

210] [parties were not separated during temporary reconciliation, when they lived in same house but slept in different rooms]; *Romanchek v. Romanchek* (1967) 248 Cal.App.2d 337, 342 [56 Cal.Rptr. 360] [parties were not separated when husband lived in "separate quarters" during apparent attempt to reconcile]; cf. *Popescu v. Popescu* (1941) 46 Cal.App.2d 44, 52 [115 P.2d 208] [divorce granted even though parties were still living in the same house; wife unsuccessfully sought order evicting husband from home, occupied separate, locked rooms, refused to speak to husband, and called police on two occasions when husband entered her rooms].)

We note that decisions from several other jurisdictions explicitly hold that parties residing in same house are not living separate and apart. (See, e.g., *Succession of Le Jeune* (1952) 221 La. 437, 445 [59 So.2d 446, 449] [where husband occupied garage, the parties were not "living separate and apart"]; *Rafferty v. Rafferty* (1949) 337 Ill.App. 277, 282 [85 N.E.2d 845, 847] [even assuming wife slept in a separate room, the parties were not living "separate and apart"]; *Christiansen v. Christiansen* (1942) 68 R.I. 438 [28 A.2d 745, 746-747] [although husband slept in separate room, the parties did not live "separate and apart"]; *McDaniel v. McDaniel* (1942) 292 Ky. 56 [165 S.W.2d 966, 967] ["The accepted meaning of the term 'living apart' is to live in a separate abode"]; cf. *In re Marriage of Eltrevoog* (1982) 92 Ill.2d 66, 68 [64 Ill.Dec 936, 440 N.E.2d 840, 841] [statute requires residence in "a separate abode"]; but see *Graves v. Graves* (1906) 88 Miss. 677 [41 So. 384] [divorce may be awarded on ground of wife's abandonment, even though parties lived under same roof, where wife occupied separate portion of house, refused to take meals with husband, and refused to cohabit with him]; *Gove v. Crosby* (1954) 98 N.H. 469, 473 [102 A.2d 905, 906-907] [for purposes of succession statute, decedent was "justifiably" living apart from abusive surviving husband, even though she did not occupy a separate dwelling]; *State v. Brecheisen* (1984) 101 N.M. 38, 42 [677 P.2d 1074, 1078] [for purposes of criminal rape statute requiring a nonspouse victim, parties may be "living apart" despite the lack of separate abodes].)

The plain language of the statute and the weight of persuasive authority thus support the view that spouses are not "living separate and apart" within the meaning of the statute unless they reside in different places. Typically, that would entail each spouse taking up residence at a different address.

Husband urges that a rule requiring separate dwellings as a predicate to separation "could preclude California's less affluent couples from establishing a date of separation and ending the accumulation of community property." We are not persuaded by that argument. In the first place, it flies in the face of the strong presumption of community property that generally applies

in this state. (See, e.g., *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th at p. 734; but see *In re Marriage of Peters, supra,* 52 Cal.App.4th at pp. 1491-1494.) In addition, the argument has an especially hollow ring here, since these parties clearly cannot be characterized as "less affluent." Furthermore, and sadly, economic disadvantage is an unavoidable incident of the process of separation and divorce for many people. But that unfortunate state of affairs is not a sufficient basis for courts to ignore a clear statutory mandate. To the extent Husband is making a policy argument, it is more appropriately directed to the Legislature.

In any event, our conclusion does not necessarily rule out the possibility of some spouses living apart physically while still occupying the same dwelling. In such cases, however, the evidence would need to demonstrate unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof.

But even acknowledging that there may be cases in which parties could remain under the same roof and still *live apart physically* within the meaning of the statute, this is not such a case. True, the parties here slept in separate bedrooms, but they had done so for nearly four years before Husband announced his decision to finally end the marriage. In this case, nothing changed as a result of Husband's decision to separate except the parties' habit of sometimes taking Sunday dinner alone together. It seems to us that—at a minimum—the physical separation required by the statute must be qualitatively different from the parties' conduct during their ongoing marriage. Here, it was not.

Thus, even if we apply the deferential substantial evidence test here, we find no objectively ascertainable conduct demonstrating a physical separation that was qualitatively different from the parties' living arrangements during their ongoing marriage. Absent evidence of such conduct, there is no support in the record for the trial court's finding that the parties separated on June 28, 1998.

## CONCLUSION

Spouses must be "living separate and apart" in order to separate. (Fam. Code, § 771, subd. (a).) "Living separate and apart" requires the contemporaneous conjunction of intent to separate and conduct evidencing that intent. At the threshold, the required conduct includes some objectively ascertainable form of physical separation.

As applied in this case, the statute requires the spouses to establish separate residences as a predicate to separation. According to the undisputed

evidence, Husband and Wife continued to occupy the family home together until August 15, 1998. At the earliest, then, separation could not occur before that date. The trial court thus erred in determining that the parties separated on June 28, 1998.

DISPOSITION

We reverse the order determining the date of separation and we remand this matter to the trial court for further proceedings. In determining the date of separation, the trial court is instructed: (1) that the parties' physical separation is a threshold prerequisite to separation; and (2) that the parties' other conduct may be considered only to the extent that it is contemporaneous with the intent to separate.

Wife shall have costs on appeal.

Rushing, J., concurred.

**BAMATTRE-MANOUKIAN, Acting P. J.,** Dissenting.—The majority concludes that "the trial court incorrectly applied the law in this case" (maj. opn., *ante*, at p. 1155) and that "there is no support in the record for the trial court's finding that the parties separated on June 28, 1998." (Maj. opn., *ante*, at p. 1164.) In reaching this conclusion, the majority formulates a new standard. Although acknowledging, at least in concept, that spouses can be "living separate and apart," within the meaning of Family Code section 771, subdivision (a), while occupying the same residence, the majority finds that in such a case the evidence must show "unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof." The majority finds that the parties' conduct here did not meet this standard and that the trial court therefore erred in selecting a date of separation prior to the time that husband physically moved out of the family home.

I respectfully disagree. I believe that this court must defer to the trial court's determination of the date of separation if the trial court's findings are supported by substantial evidence. (*In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 435 [181 Cal.Rptr. 910].) This deferential review is particularly appropriate in family law matters where the testimony of the parties often is, as in this case, in conflict, and where the trial court is called upon to make credibility judgments. My review of the record indicates that the evidence, including reasonable inferences to be drawn therefrom, supports the trial court's finding that the date of separation was June 28, 1998. I would therefore affirm the decision of the trial court.

As the majority observes, "the Legislature has neither defined 'date of separation' nor specified a standard for determining it." (*In re Marriage of*

*Hardin* (1995) 38 Cal.App.4th 448, 450-451 [45 Cal.Rptr.2d 308].) Courts have generally agreed that spouses are "living separate and apart" within the meaning of the statute on the date they come to a " 'parting of the ways with no present intention of resuming the marital relations.' " (*Id.* at p. 451, italics omitted.) There are no particular facts that are "per se determinative" as to when this occurs. (*Id.* at p. 452.) However, as the majority points out, case law has established that two factors must be present to support a finding of legal separation: there must be a subjective intent on the part of at least one of the spouses to end the marriage and there must be objective conduct furthering that intent and indicating a "complete and final break in the marital relationship." (*Ibid.*; *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 735 [28 Cal.Rptr.2d 447].) The majority finds the first factor was "amply supported" by husband's testimony that he clearly communicated his intent to end the marriage to his wife on June 28, 1998. However, the majority concludes that the second factor was not shown, both because of the timing of the conduct implementing the decision to end the marriage and also because the conduct was not "unambiguous, objectively ascertainable conduct amounting to a physical separation."

The majority concludes that the intent to end the marriage and the conduct furthering that intent must be present "simultaneously" and that "[l]ater conduct that is merely consistent with an earlier decision to separate does not support an earlier separation date." (Maj. opn., *ante*, at p. 1160.) I do not believe this is a workable rule in the realm of family law. Parties who have reached a decision as difficult and emotional as ending a lengthy marriage may often be unable to simultaneously engage in such clear-headed conduct as changing legal title on properties, closing bank accounts, dividing funds and establishing new bank accounts, discontinuing and applying for new credit cards, and arranging for new housing. It may be that one spouse has not worked during the marriage or that there is a great disparity in income to be taken into account. There may be efforts to maintain some continuity for the children, and to resolve issues involving shared custody. Surely the parties should be allowed a transition period to take the necessary steps to untangle the financial, legal and social ties incident to their decision to change their marital status.

Cases cited in the briefs where courts have refused to find that the parties have separated generally have involved spouses who, though they may be living separately, continue to maintain ongoing financial, social, and sometimes sexual, relations for months or even years. In those cases neither party has clearly communicated an intent to completely end the marriage and courts have found that their conduct was inconsistent with such an intent. (See, e.g., *In re Marriage of Hardin, supra,* 38 Cal.App.4th 448; *In re*

*Marriage of Baragry* (1977) 73 Cal.App.3d 444 [140 Cal.Rptr. 779]; *In re Marriage of von der Nuell, supra,* 23 Cal.App.4th 730.)

Here, on the other hand, the parties had been living basically as "room-mates" for a number of years when husband communicated his intent on June 28, 1998, to end the marriage. They had few, if any, common interests and spent time together infrequently, with the exception of Sunday night dinners. After June 28, 1998, they stopped even these dinners. On the night of June 28, 1998, after informing his wife of his decision, husband also communicated to their 13-year-old son that the couple planned to divorce. In addition husband told his wife that night that he intended to move into the rental property they were in the process of purchasing.

Conduct consistent with this expressed intent, and directed to effectuate a physical separation and eventual divorce, occurred thereafter over a rela-tively short amount of time. As husband testified, "that was the plan and that was what we did." Husband explained that he could not move out immedi-ately because the rental house was not ready. The escrow closed in mid-July, following which husband carried out substantial repairs and refurbishment to the property, purchased necessary furnishings and appliances, and took other steps to prepare the property for occupancy. Once repairs were complete, he moved into the new residence on August 15, 1998. Wife went through the family home, put labels on the furniture that husband would be taking to his new residence, and helped husband pack. Husband informed colleagues at work, including his supervisor and the vice-president of human resources, that he and his wife were getting a divorce, and he shared the decision with another close friend. Husband heard from a close friend of wife's, who asked if there was anything to be done to save the marriage. The parties sat down together several weeks after the decision on June 28, 1998, to end the marriage and they made a list of their assets, worked out a tentative division of their property, including real estate, and developed a visitation plan for the children. All of this was eventually carried out in accordance with notes made during this discussion.

In sum I believe the trial court was entitled to determine whether this conduct occurred sufficiently close to the date of June 28, 1998, to demon-strate an intent to implement the decision on that date to end the marriage. In my view a rule that would require that conduct be absolutely "contempora-neous" with the expression of intent unduly restricts the trial court's ability to weigh all of the evidence of the parties' conduct.

I would also reject the imposition of a standard by which the trial court must find the parties' conduct to be "unambiguous, objectively ascertainable

conduct amounting to a physical separation . . . ." The court must be allowed to consider all conduct and other factors bearing on either party's intentions to return or not to return to the marital relationship. "The ultimate test is the parties' subjective intent and all evidence relating to it is to be objectively considered by the court." (*In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 452.) The determination of intent is a question of fact addressed to the trial court and subject to proof by a preponderance of the evidence. (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1494 [61 Cal.Rptr.2d 493].)

There may well be conduct by the parties during a time of emotional upheaval and change that cannot be characterized as unambiguous. For example here, following the June 28, 1998 date, the family went on a preplanned trip to Canada together. Husband asked wife if she would like to meet him in London. Husband sent wife flowers and a note on their anniversary. The family celebrated a birthday together. The parties made gifts of stock to wife's relatives. The inference could be drawn that such conduct reflected husband's wavering intent or change of heart about ending the marriage. On the other hand, this conduct could mean what husband contended it did: that he did not want to disappoint the children by canceling vacation plans, that he wanted to show respect for his wife's feelings, and that he wanted to keep family relations on amicable terms and "keep the kids on an even keel." These questions were for the trial court, having heard both parties' testimony, to decide. Where the evidence is subject to different inferences, we must accept the inferences reasonably drawn by the trial court in support of the judgment. (*Hotaling v. Hotaling* (1924) 193 Cal. 368, 379 [224 P. 455, 56 A.L.R. 734].)

I believe the standards developed in the cases discussing the date of separation, within the meaning of Family Code section 771, provide sufficient guidance for trial courts. The court is entitled to consider and evaluate all of the evidence bearing on the relevant span of time in the parties' relationship, and to draw reasonable inferences. As the court in *In re Marriage of Hardin* explained, the court is to examine "the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final." (*In re Marriage of Hardin, supra,* 38 Cal.App.4th at p. 453, fn. omitted.)

Here the court heard lengthy testimony by both parties, who had the opportunity to explain their conduct and underlying intent. The court also heard testimony from three other witnesses. The vice-president of human resources and administration at husband's company testified that husband told her around July 4, 1998, that he and his wife were separating. Wife's

first attorney testified that wife opposed the divorce and believed reconciliation was possible, and that wife had suggested the date of August 15, 1998, when husband moved out, as the date of separation. Wife's second attorney also testified. On behalf of wife, he had entered into a stipulation changing the date of separation to June 21, 1998. He testified that this occurred during settlement negotiations and was the result of a misunderstanding. In addition, the court received documentary evidence, including the notes from the parties' meeting in which they discussed dividing assets, copies of records of bank account and charge card activities, an address change request, stock certificates, and escrow statements. The parties submitted written argument. The court then made detailed findings, and modified those findings in response to wife's requests for clarification. The court's statement of decision clearly shows that it considered and resolved the issues, in particular the questions of timing and the evidence of equivocal conduct.

The court found that on June 28, 1998, the parties "discussed separation and that this was the end of the marriage. . . . [Husband] was committed to the decision to end the marriage and clearly communicated this to [wife]. Ultimately, during this same conversation, they agreed that [husband] would move into the rental that was being purchased by the parties and [wife] would remain in the family residence. While the physical move of the [husband] did not occur right away, the parties' conduct was consistent with the initial discussion on June 28, 1998 regarding separation, and, eventually, a dissolution."

The court noted that the parties continued to use joint bank accounts after June 28, 1998, until shortly after September 15, 1998. The court found, however, that "this was how they had always handled their finances and they had not agreed to change that pattern. It is not unusual for parties in dissolution cases to continue to use joint accounts for many months after filing for dissolution and separating. This is not in and of itself determinative of the date of separation." The court also found that conduct to carry out planned gifts of stock to relatives and to acquire real estate in joint tenancy was "not inconsistent with the earlier date of separation. The parties discussed and agreed that the [husband] would occupy the rental that they were acquiring. . . . Once the parties took title, certain repairs had to be done, so the [husband] could not move immediately. By the time he did move, the parties had discussed and agreed upon a partial division of their personal property." Finally, the court resolved the parties' conflicting testimony by finding that the wife "did not believe that [husband] would carry out his stated intention to end the marriage . . . . [She] simply could not recognize that it was over."

The court concluded as follows: "Based upon all of the evidence before the Court, the Court finds that the date of separation of the parties was June

28, 1998. The parties discussed separation and divorce and [husband] clearly communicated his intention to end the marriage. The parties never discussed reconciliation after that date. Their conduct, including the separation of their personal property, the move of the [husband] to the newly acquired jointly held rental property, and the ultimate filing of this action, are consistent with the earlier date of separation and the parties' implementation of the separation process. [¶] Physical separation is not necessarily determinative of separation. Parties can, and often do, agree to terminate their marriages and commence a course of conduct to implement a physical separation. The parties in this case parted ways and their overall conduct demonstrated clearly that their marriage had completely broken down. The totality of conduct of the parties both on and after the date of the discussion of their separation adequately supports the date of separation of June 28, 1998."

I acknowledge that this is a close case, but I would conclude that the trial court carefully considered all of the evidence, correctly applied the law and reached a result that is supported by the record. As the majority acknowledges, we exceed our role as a court of review if we reweigh the evidence. Applying the substantial evidence test, I would therefore affirm the trial court's determination that the date of separation was June 28, 1998.