Filed 10/25/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of SHERYL JONES DAVIS and KEITH XAVIER DAVIS. | |
| SHERYL JONES DAVIS,<br><br>        Respondent,<br><br>v.<br><br>KEITH XAVIER DAVIS,<br><br>        Appellant. | A136858<br><br>(Alameda County<br>Super. Ct. No. RF08428441) |

In this bifurcated marital dissolution proceeding, appellant Keith Xavier Davis (Xavier) appeals from an interlocutory order establishing the date of separation under Family Code section 771.[1]  He contends the trial court erred in finding the date of separation to have occurred approximately five years before respondent Sheryl Jones Davis physically moved out of the family home.  We affirm.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The parties[2] were married on June 12, 1993.  They have two children, a daughter born in August 1995 and a son born in November 1999.  The couple stopped being sexually intimate in 1999, after their son was conceived.  They also did not go out on any

---

[1] The trial court certified the issue for appeal and we agreed to hear it.  (Cal. Rules of Court, rule 5.392.)  All further statutory references are to the Family Code unless otherwise stated.

[2] As is customary in marital dissolution actions, we refer to the parties hereinafter by their first names.  (*In re Marriage of James and Christine C.* (2008) 158 Cal.App.4th 1261, 1264, fn. 1.)

"dates" after their son was born. The parties disagreed as to when they stopped sharing a bedroom. Xavier testified Sheryl moved to another bedroom in 2001, while Sheryl testified this happened in 2004.

The parties maintained a joint bank account. In 2001, Xavier was earning approximately $180,000 per year and Sheryl was earning about $115,000. In 2003, Sheryl opened a separate bank account that she used to manage her business funds and allocate money for personal expenses.

In January 2006, Xavier accepted a job working for Clorox at an annual salary of $240,000, or $20,000 per month. He left this job in September 2006. During the time he worked at Clorox, he caused his earnings to be deposited into a separate Wells Fargo bank account. He continued to contribute $3,200 to the joint account, which the parties had been using to pay household bills.

By June 2006, Sheryl had been without a job for six months. During that time, she worked as an independent contractor, earning about $3,000 to $4,000 per month. She was frustrated by Xavier's decision to retain the balance of his Clorox earnings for himself, rather than to increase his contribution to the community account. She was also concerned because she did not have a key to a safe that was in the home, she was not informed about the separate bank account that Xavier had opened, and she was not given access to their Charles Schwab account.

On June 1, 2006, Sheryl announced to Xavier her intent to end the marriage.[3] She presented him with a "financial ledger" that itemized every household expense. She did this because she wanted the parties to contribute equally to running the home and funding the children's expenses, while being solely responsible for their own respective personal expenses.

In July 2006, Sheryl began working as a salaried employee at a new job, earning $138,000 per year, which equates to $11,500 per month. She made arrangements to have

---

[3] At trial, Sheryl testified she could not recall the exact date, but that the separation occurred between June 1, 2006 and July 1, 2006.

2

her share of the household expenses deposited into the couple's joint account, placing the balance of her payroll deposit into a new personal account "because, as far as I was concerned, the marriage was done." She continued to live in the marital home with Xavier. She kept her personal belongings in the home, received mail and telephone calls at the home, and cooked meals at the home.

On December 30, 2008, Sheryl filed for dissolution. In her petition, she listed the date of separation as June 1, 2006.

On February 4, 2009, Xavier filed a response, stating the date of separation was January 2, 2009.

Sheryl remained in the family home until July 2011.

At trial, the issue of the date of separation was bifurcated from the other issues and tried separately. Trial thereon was heard on four separate days, commencing on January 10, 2012.

On March 8, 2012, Xavier filed an amended response in which he listed the date of separation as July 1, 2011—the approximate date Sheryl moved out of the marital residence.

On May 2, 2012, the parties filed a stipulation in which they stipulated to certain facts pertaining to the date of separation. That same day, the trial court announced its decision from the bench, holding that the date of separation of the parties was June 1, 2006.

On May 17, 2012, the trial court filed its initial statement of decision.

On August 27, 2012, the trial court signed and filed a revised statement of decision. This appeal followed.

## II. DISCUSSION

The sole issue before us is the date of separation. Xavier claims the trial court erred when it determined June 1, 2006 to be the date of separation. He predominately bases his argument on the fact that the parties did not physically separate until July 1, 2011. We are satisfied that substantial evidence supports the court's decision.

3

**A.** *Standard of Review*

While the date of separation is a factual issue to be determined by the preponderance of the evidence (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1493–1494), "[o]ur review is limited to determining whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1360.) Thus, even if we would have reached a different conclusion based upon the evidence at trial, we do not reweigh the evidence and will affirm the judgment as to the date of separation if it is supported by substantial evidence. (See *Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 849, fn. 11 ["Under the substantial evidence test, courts do not reweigh the evidence. They determine whether there is any evidence (or any reasonable inferences which can be deduced from the evidence), whether contradicted or uncontradicted, which, when viewed in the light most favorable to . . . a court's judgment, will support the . . . judicial findings of fact."]; *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 435 [trial court's finding of separation date supported by substantial evidence].)

**B.** *Standards for Determining the Date of Separation*

Although the Legislature has declared "[t]he earnings and accumulations of a spouse . . . , while living separate and apart from the other spouse, are the separate property of the spouse" (Fam. Code, § 771, subd. (a)), it has not further defined the date of separation or specified a standard for determining that date. Accordingly, the courts rely on case law to define the date of separation.

In *Makeig v. United Security Bk. & T. Co.* (1931) 112 Cal.App. 138, 143 (*Makeig*), the appellate court determined that living separate and apart is a "condition where the spouses have come to a parting of the ways and have no present intention of resuming the marital relations and taking up life together under the same roof." This definition was amplified in *In re Marriage of Baragry* (1977) 73 Cal.App.3d 444, 448 (*Baragry*): "The question is whether the parties' conduct evidences a complete and final

4

break in the marital relationship." (Accord, *In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647, 657 (*Umphrey*).)

In *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730 (*von der Nuell*), the appellate court blended the *Makeig* and *Baragry* definitions, stating: "[B]ecause rifts between spouses may be followed by long periods of reconciliation, and the intentions of the parties may change from one day to the next, we construe *Baragry* to hold legal separation requires not only a parting of the ways with no present intention of resuming marital relations, but also, more importantly, *conduct* evidencing *a complete and final break* in the marital relationship." (*Von der Nuell*, at p. 736.) Thus, a court decides the date of separation by examining two components, one subjective and the other objective. (*In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1158–1159 (*Norviel*).) The subjective component examines whether either of the parties harbors the subjective intent to end the marriage. The objective component examines whether there is objective conduct evidencing and in furtherance of that intent. (*Ibid.*)

## C. *Substantial Evidence Supports the June 1, 2006 Date of Separation*

### 1. *Sheryl's Evidence*

Sheryl testified she believed the marriage was over in March 2000, but that she kept up appearances for the sake of the children for eight years before filing for divorce. She explained that the parties agreed to stay together because they both came from two-parent households and did not want their children to experience separation from either parent.

Xavier physically assaulted Sheryl in October 2005. In her mind, this was the "last straw." However, at that time she was dealing with some issues regarding their son and the local school district. In June 2006, when the school year had concluded, she announced to Xavier that the marriage was over. She told him she would continue contribute to her half of the household expenses. In order to segregate the parties' finances, she developed a spreadsheet that itemized every single household expense and the anticipated expenses for the children, of which they were to each pay 50 percent by

5

making deposits into the community account.  Any other money would be kept by each as their own money to spend as they wished.

After June 1, 2006, Sheryl took Xavier off of her credit card and ceased making any charges on his credit cards.  Each person became responsible for his or her personal expenses for gas, food, personal credit cards, gym memberships, and life insurance premiums.  When he failed to contribute enough to the community bank account to cover his half of their joint costs, she decided to divide and allocate the individual community expenses.  She created the ledger to show which bill each person was responsible for paying.

Sheryl testified that she continued to live in the home after June 2006 because it was her home just as much as Xavier's, but she made an effort to keep their interactions to a minimum.  The job that she started in July 2006 was based in Los Angeles, and she would go there every week and stay at a hotel between three to five nights each time.  In her mind, the parties became more like roommates, and she participated in family events solely for the sake of the children.  This testimony is supported by an e-mail message Xavier sent to her in March 2007 (before he claims the separation took place) stating: "Its [*sic*] not about us desiring to have dinner together when we are all in the same house but about a need that our children have to develop a good healthy sense of family dinner. Its [*sic*] not about us desiring any particular thing but agreeing to be functional as long as we are in the same home. . . . *I don't have any reason in the world to be positive or friendly with regard to you (your motives are clear) but until we are engaged in dissolution, we both need to be selfless to protect our children's perspective of family.*" (Italics added.)

Family togetherness was minimized as much as possible.  The family had a prepaid trip to Hawaii in 2006 and the parties did not want to disappoint their children because they were accustomed to going to Hawaii every year.  The parties slept in the same hotel room, but they did not share a bed.  Instead, they would get a room with two beds and each parent would sleep with one of the children.  From that point on, Sheryl took the children on two vacations every year, one to Las Vegas and the other to Hawaii.

6

She also took them to a family reunion. In 2008, she took the children to Las Vegas and Hawaii again. Xavier took them on a train excursion. Sheryl did not accompany him on that trip because "as far as I was concerned we were no longer a family."

The parties also drove separate cars to back-to-school nights. Sheryl would not ride in the same car as Xavier unless the children begged her to do so. He would invite her to go on family vacations with him and the children, but she would always decline to go. She never invited him to go on her vacations with the children. The parties continued to celebrate birthdays and other special occasions by going out to restaurants together. December 2010 was the first year they did not exchange Christmas gifts.

Sheryl reassessed her living situation after she was forced to pay all of the community expenses beginning in February 2011, when Xavier said he did not have any money. She paid these expenses from that point on until when she moved out in July 2011.

### 2. *Xavier's Evidence*

At trial, Xavier testified that the marriage did not change after June 1, 2006. The couple still had issues and arguments, but over time things would normalize and they would continue doing everything that they had previously done. The ledger system was a new circumstance, but he agreed to it as a way to enable bills to get paid even though he did not like it. He conceded that by then the parties had an "abnormal and dysfunctional marriage," but this was true for most of their marriage. He did not really notice a change in the relationship until Sheryl moved out in July 2011.

Xavier confirmed Sheryl had presented him with a ledger in June 2006. He agreed to use it because he did not want money to become another issue in their marriage. Though Sheryl did announce at the same time that she wanted a divorce, he did not perceive anything unusual because she had threatened divorce before. He was served with her divorce papers in January 2009.

### 3. *The Trial Court's Ruling*

The trial court noted that Sheryl had consistently maintained the date of separation was June 1, 2006. When Xavier filed his responsive papers to her dissolution petition, he

selected January 2, 2009 as the date of separation. At trial, he advocated the much later date of July 1, 2011. The court also observed the parties are very knowledgeable about financial matters, and therefore decisions about their finances could be deemed quite significant. The court noted there were no cases holding that a party could claim the date of separation occurred *after* having filed a response in a divorce case, as Xavier had attempted to do at trial.

Relying on *In re Marriage of Hardin* (1995) 38 Cal.App.4th 448 (*Hardin*) and *In re Marriage of Manfer* (2006) 144 Cal.App.4th 925 (*Manfer*), the trial court found Sheryl's articulation of her intent to end the marriage, the contemporaneous change in how the parties handled their finances, and the fact that active divorce litigation had commenced a year and a half *prior* to Xavier's proposed date of separation, were factors that supported the existence of her date of separation over his.

**D. Norviel *is Not Dispositive***

At trial, Xavier relied on *Norviel, supra,* 102 Cal.App.4th 1152 in support of his argument that the date of separation was July 1, 2011, the date Sheryl moved out. He renews this argument on appeal. We are not persuaded.

Similar to the facts of the present case, the parties in *Norviel* had two children and both parties worked long hours and travelled frequently. They stopped sleeping in the same bedroom after the birth of their second child. They then began living as "roommates," sharing few common interests or activities. The couple occasionally had family dinners together, and would try to have Sunday night dinners together without the children. (*Norviel, supra,* 102 Cal.App.4th at p. 1155.) In June 1998, during a Sunday dinner, the husband announced his decision to end the marriage. However, nothing changed after his announcement except for the cessation of private Sunday dinners. Instead, the parties continued to live in the marital home, kept their joint bank accounts open, and even went on a vacation together, though they did not sleep together. The husband also continued to use the mailing address and telephone number of the family home, and took occasional meals and outings with the family for the sake of the children. In August 1998, the husband moved out of the marital home. (*Id*. at p. 1155.) The trial

8

court determined the date of separation to be the date when the husband stated his intention to end the marriage. (*Id*. at p. 1154.) The wife appealed. (*Id*. at p. 1156.)

The appellate court noted that under Family Code section 771, subdivision (a), "two factors emerge as prerequisites to separation. First, at least one spouse must entertain the subjective intent to end the marriage; second, there must be objective evidence of conduct furthering that intent." (*Norviel, supra,* 102 Cal.App.4th at pp. 1158–1159.) In a more controversial passage, the *Norviel* court said: "[L]iving apart physically is an *indispensable threshold requirement* to separation, whether or not it is sufficient, by itself, to establish separation." (*Id*. at p. 1162, italics added.) The court reasoned that "spouses are not 'living separate and apart' within the meaning of the statute unless they reside in different places. Typically, that would entail each spouse taking up residence at a different address." (*Id*. at p. 1163.) The court acknowledged that its conclusion "does not necessarily rule out the possibility of some spouses living apart physically while still occupying the same dwelling. In such cases, however, the evidence would need to demonstrate *unambiguous, objectively ascertainable conduct* amounting to a physical separation under the same roof." (*Id*. at p. 1164, italics added.)

Relying on *Norviel,* Xavier claims Sheryl could have afforded to rent a small apartment if she had wanted to physically separate from him. He also notes the household maintained "business as usual" after June 2006, with Sheryl receiving her mail at the house, keeping her belongings at the home, and cooking meals. Further, they had already been sleeping in separate bedrooms "for years" before she announced her decision to end the marriage. Thus, according to Xavier, "[t]here was no qualitative difference in the parties' conduct or **physical separation** after June 1, 2006, as specifically required in *Norviel*. As in *Norviel,* nothing changed physically between the parties after Sheryl's announcement that she wanted to end the marriage." He argues that in failing to rule consistent with the holding of *Norviel,* the trial court's decision was erroneous "as a matter of law."

We reiterate that the standard of review here is the substantial evidence standard, not the de novo standard applicable to errors of law. We also find the issue of physical

separation is more persuasively discussed in the other cases relied on by the trial court, *Hardin, supra,* 38 Cal.App.4th 448, 452 ("All factors bearing on either party's intentions 'to return or not to return to the other spouse' are to be considered. [Citation.] No particular facts are per se determinative."), and *Manfer.* These cases stand for the proposition that physical separation is but one factor to consider in determining the date of separation.

In *Hardin,* the husband moved out in 1969, 14 years before dissolution of the marriage. The wife contended the couple separated in 1983 when the husband went forward with the dissolution proceeding. The trial court, however, concluded the separation occurred in 1969, when the husband moved out of their residence, based on a theory that " ' "society at large" ' " would construe this as the date when separation occurred. (*Hardin, supra,* 38 Cal.App.4th at p. 450.) The appellate court reversed, synthesizing a two-part test from its review of case law: "Simply stated, the date of separation occurs when either of the parties *does not* intend to resume the marriage *and* his or her actions bespeak the finality of the marital relationship." (*Id*. at p. 451.) In its opinion, the court observed: "Maintenance of separate residences is not necessarily indicative of separation." (*Id.* at p. 454, fn. 5.) The court did not find this factor to be determinative. (*Ibid*.)

In *Manfer,* the husband moved out and rented an apartment after the couple's 31st wedding anniversary, and the wife decided "the stormy marriage was finally over." (*Manfer, supra*, 144 Cal.App.4th at p. 928.) But they decided not to tell their children, family, or friends that they were getting a divorce. They continued to keep up the façade of a marriage. Similar to the instant case, the pair continued to have sporadic social contacts and take an occasional trip together, but they did not engage in sexual relations with one another, commingle their funds, or support one another. (*Ibid.*) The trial court found that the couple merely had a private understanding that their marriage was over, finding the date of separation to be later, after the couple started telling other people they were getting a divorce. (*Id.* at pp. 930–931.) The appellate court reversed, stating the question is not what society at large would have perceived, but what the parties'

10

subjective intent was as " 'objectively determined *from all of the evidence* reflecting the parties' words and actions during the disputed time . . . .' " (*Id*. at p. 930, italics added.)

In another case, *von der Nuell, supra,* 23 Cal.App.4th 730, the husband moved from the family home on November 1, 1987. However, up until the spring of 1991, the parties maintained joint checking accounts, credit cards, and tax returns, and took joint title to an automobile. The husband stayed in close contact with wife, including making frequent visits to the home. He took her on vacations, and they went out socially, sent cards and gifts on special occasions and holidays, and continued having sexual relations with one another throughout the period between early 1988 and the spring of 1991. The husband also continued to contribute financially to the community. (*Id.* at p. 733.) The parties also attempted to reconcile until June 1991, when the wife decided to end the marriage after learning of the husband's intent not to pay any further support to the marital community. (*Id.* at pp. 736–737.) The appellate court concluded the trial court erred in holding the date of separation to be in November 1987. The court noted that given the "ongoing economic, emotional, sexual and social ties between the parties and their attempts at reconciliation, regardless of the parties' present intention on November 1, 1987, a complete and final break in the marriage did not occur at that time." (*Id.* at p. 737.)

While the cases summarized above involve spouses who had already moved out of the family home while continuing to maintain ongoing financial and social relations, thereby evidencing a lack of true marital separation, we see no reason why the inverse rationale can not be applied to a spouse who continues to live in the family home but who, in every meaningful way, has abandoned the marital relationship. In this respect, we disagree with the bright line drawn by the majority in *Norviel,* and find the dissenting opinion by Justice Bamattre-Manoukian to be compelling. In her dissent, she asserted that the majority had demanded too much of the evidence in calling for "unambiguous, objectively ascertainable conduct" with respect to cohabitating parties, noting that the fact finder is entitled to draw reasonable inferences from *all* the evidence presented. (*Norviel, supra*, 102 Cal.App.4th at pp. 1167–1168 (dis. opn. of Bamattre-

11

Manoukian, J.).) We agree with the observation that the quoted standard is unduly rigid, at least in light of the facts at issue in the present case.

Here, the parties both testified and were the only witnesses to the facts of separation. It was thus for the trial court to evaluate the evidence under the two-part test that is derived from *Baragry*, *supra*, 73 Cal.App.3d 444. We also note that in *Norviel,* the couple continued to engage in financial conduct together. They obtained real estate jointly. They also handled stock deals together and invested $71,000 in a joint account *after* the alleged date of separation. (*Norviel, supra,* 102 Cal.App.4th at p. 1156.) These facts present a more clouded picture of intent, and serve to distinguish *Norviel* from the present case.

Xavier also urges that the evidence presented at trial supports his claim that the date of separation occurred after 2006, either on January 2, 2009 (the date he set forth in his response to Sheryl's petition) or July 1, 2011 (when Sheryl moved out), or some other date that the court should have independently determined.[4] There is evidence, however, to support a different conclusion.

As summarized above, Sheryl's testimony tends to support the trial court's conclusion that June 1, 2006, the date she imposed strict segregation of the parties' individual finances, is the date of separation. The evidence suggests it was at this point that the parties' dysfunctional relationship devolved to where they had essentially become roommates and coparents, maintaining separate finances and cooperating only to the extent necessary to maintain the household and cover their children's expenses. In all

---

[4] Posttrial, and on appeal here, Xavier has claimed that the trial court erroneously believed it had to pick one of two dates, either the June 1, 2006 date urged by Xavier or the July 1, 2011 date argued by Sheryl. He claims the court erred in refusing to consider selecting a day between these two choices. However, the court noted that during the trial Xavier was asked if he wanted to argue for any other date, and he declined to do so. Thus, the point has been waived. We also conclude his reliance on *Umphrey, supra*, 218 Cal.App.3d 647 is misplaced, as the appellate court there found the date the trial court felt bound by had merely been recited in a marital agreement, and "was never adjudicated in any meaningful sense . . . ." (*Id.* at p. 656.) In the present case, evidence was presented to support the June 1, 2006 date selected by the trial court here.

other respects, their social relationship was limited to basic interactions undertaken solely for the sake of their children.  While Xavier raises his legal challenge based on the fact that Sheryl did not vacate the family residence until July 2011, he does not directly challenge the veracity of the evidence Sheryl offered at trial.  Instead, he contests the inferences drawn by the trial court from the evidence presented.  In particular, he argues that the introduction of the expense ledger did not represent a substantial change in the marriage, but rather was merely a symptom of a marriage that had "continued to limp along it its dysfunctional state for years."  Again, it is not the task of this court to reweigh the evidence.  Having concluded that *Norviel* does not control the outcome of this case, we find substantial evidence supports the trial court's ruling.

### III.  DISPOSITION

The judgment is affirmed.

_____
Dondero, J.

We concur:


_____
Margulies, Acting P. J.


_____
Sepulveda, J.[*]


A136858
*In re Marriage of Davis*

---

[*] Retired Associate Justice of the Court of Appeal, First Appellate District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Trial Court:   Alameda County Superior Court

Trial Judge:   Elizabeth Hendrickson, Commissioner

Counsel:

Law Office of Stephanie J. Finelli and Stephanie J. Finelli for Appellant.

Ferguson Case Orr Paterson LLP and Wendy C. Lascher for Respondent.