[No. G037269. Fourth Dist., Div. Three. Nov. 9, 2006.]

In re the Marriage of SAMUEL and MAUREEN MANFER.
SAMUEL MANFER, Respondent, v.
MAUREEN MANFER, Appellant.

## COUNSEL

Phillips, Whisnant, Gazin & Gorczyca, Gary S. Gorczyca, Jordan B. Nefulda and J. Benedict Phillips for Appellant.

Angelo & White, Joseph Angelo, Nicole R. Combs and Davil R. Vasquez for Respondent.

## OPINION

**IKOLA, J.**—In this bifurcated marital dissolution proceeding, Maureen Manfer appeals from an interlocutory order establishing the date of separation under Family Code section 771.[1] We conclude that although the court correctly found on the basis of substantial evidence that the parties' private conduct demonstrated a complete and final break in their marital relationship in June 2004, it erroneously applied an "outsider's viewpoint" standard to defer the date of separation to March 15, 2005, after the parties had revealed to the world their hitherto secret that the marriage was over.

Although we review the result, not the trial court's reasoning (*Woolridge v. J.F.L. Electric, Inc.* (2002) 96 Cal.App.4th Supp. 52, 60, fn. 4 [117 Cal.Rptr.2d 771]), here we must observe the statement of decision clearly indicates the court relied on *In re Marriage of Baragry* (1977) 73 Cal.App.3d 444 [140 Cal.Rptr. 779] (*Baragry*) to conclude that regardless of the parties' subjective intentions and the objective evidence relating thereto, the date of separation depends on whether society at large would consider the parties separated. In his respondent's brief, Samuel vigorously argues the propriety of that standard. But *Baragry* does not establish such a test, and the application of it

---

[1] The trial court certified the issue for appeal and we agreed to hear it. (Cal. Rules of Court, rule 5.180.) All further statutory references are to the Family Code unless otherwise stated.

would work untold mischief in the lives of married couples who, for whatever innocent reason, agree to keep private the end of their relationship until they deem public disclosure appropriate. The date-of-separation test does not ask what the public thinks, but whether at least one of the parties intended to end the marriage and whether there was objective conduct "bespeak[ing] the finality of the marital relationship." (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 451 [45 Cal.Rptr.2d 308] (*Hardin*).) Under that standard, the court's selection of a March 15, 2005, date of separation, rather than some nine months earlier, is erroneous as a matter of law.

## FACTS

Maureen and Samuel Manfer married on June 16, 1973.[2] According to the trial court's unchallenged factual findings in its written statement of decision, in June 2004, about one week after their 31st wedding anniversary, the couple quarreled, Samuel moved out of the family residence and into an apartment he had previously leased, Maureen made up her mind the stormy marriage was finally over, and both parties, expressing their mutual concern about how their three daughters might be affected by the news, agreed to hide their circumstances from family and friends until after the year-end holidays. To keep up appearances, the couple continued to have sporadic social contacts and take an occasional trip together, but they did not engage in sexual relations with one another, commingle their funds, or support one another. Finally, sometime in early 2005, Maureen and Samuel told their daughters and friends they were not living together.

Samuel filed a dissolution petition in April 2005, alleging the date of separation as March 15, 2005. Maureen contended the couple separated in June 2004, and her response to the petition alleged a July 1, 2004, date of separation. At the conclusion of a two-day hearing in which the issue was bifurcated, the trial court found there was "a preponderance of the evidence that the Manfers' private conduct evidenced a final and complete break in their marital relationship in June of 2004." Nonetheless, it determined the date of separation was March 15, 2005, by expressly utilizing an "objective test" standard, i.e., "[W]ould society at large consider the couple separated?"

Maureen appeals from the order, arguing the court's determination of the date of separation constitutes legal error under section 771, subdivision (a). For the reasons we now discuss, we agree. Consequently, we reverse and remand.

---

[2] We will designate appellant and respondent by their given names for clarity of reference.

## DISCUSSION

### Legal Standards Pertaining to the Date of Separation

■ Because "[t]he earnings and accumulations of a spouse . . . while living separate and apart from the other spouse, are the separate property of the spouse" (§ 771, subd. (a)), the date of separation can be of considerable consequence with regard to the parties' property rights.[3] Although the statute does not define "date of separation" or specify a rule for determining it, and although there is no definitive authority setting forth a single standard to be employed or a comprehensive list of factors to be considered, a number of courts have attempted to enunciate guidelines.

*Makeig v. United Security Bk. & T. Co.* (1931) 112 Cal.App. 138, 143 [296 P. 673] (*Makeig*) refers to that "condition where the spouses have come to a parting of the ways and have no present intention of resuming the marital relations and taking up life together under the same roof." *Baragry, supra,* 73 Cal.App.3d at page 448, inquires "whether the parties' conduct evidences a complete and final break in the marital relationship." *In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 736 [28 Cal.Rptr.2d 447], construes *Baragry* to hold commencement of the separation period "requires not only a parting of the ways with no present intention of resuming marital relations, but also, more importantly, *conduct* evidencing a *complete and final break* in the marital relationship." *In re Marriage of Norviel* (2002) 102 Cal.App.4th 1152, 1159 [126 Cal.Rptr.2d 148] (*Norviel*), reiterates *Baragry*'s formula, but adds, "By at least one creditable definition, 'living separate and apart' means '*residing in different places* and having no intention of resuming marital relations.' " (*Id.* at p. 1162.) The *Norviel* court concludes, "Spouses must be 'living separate and apart' in order to separate. [Citation.] 'Living separate and apart' requires the contemporaneous conjunction of intent to separate and conduct evidencing that intent. At the threshold, the required conduct includes some objectively ascertainable form of physical separation." (*Id.* at p. 1164.)[4]

---

[3] There is a marked disparity in the parties' respective incomes. Because Maureen has an income of more than $1 million per year, several hundred thousand dollars are potentially at stake in the characterization of property during the disputed nine-month period from June 2004 to March 2005.

[4] The *Norviel* court decided the spouses had "to establish separate residences as a predicate to separation." (*Norviel, supra,* 102 Cal.App.4th at p. 1164.) That was only because the parties "slept in separate bedrooms, but they had done so for nearly four years before Husband announced his decision to finally end the marriage. . . . [N]othing changed as a result of Husband's decision to separate except the parties' habit of sometimes taking Sunday dinner alone together. It seems to us that—at a minimum—*the physical separation required by the statute must be qualitatively different from the parties' conduct during their ongoing marriage.* Here, it was not." (*Ibid.,* italics added.) The court theorized, "[O]ur conclusion does not necessarily rule out the possibility of some spouses living apart physically while still

■ All of these definitions are useful, but we find the standard articulated by another panel of this court more than 10 years ago most helpful: "[T]he date of separation occurs when either of the parties *does not* intend to resume the marriage *and* his or her actions bespeak the finality of the marital relationship. There must be problems that have so impaired the marriage relationship that the legitimate objects of matrimony have been destroyed and there is no reasonable possibility of eliminating, correcting or resolving these problems." (*Hardin, supra,* 38 Cal.App.4th at p. 451.) The *Hardin* court further teaches, "All factors bearing on either party's *intentions* 'to return or not to return to the other spouse' are to be considered. [Citation.] No particular facts are per se determinative. The ultimate test is the parties' subjective intent and all evidence relating to it is to be objectively considered by the court." (*Id.* at p. 452, italics added.) Stated differently, "The *ultimate question to be decided in determining the date of separation is whether either or both of the parties perceived the rift in their relationship as final.* The best evidence of this is *their words and actions.* The husband's and the wife's subjective intents are to be objectively determined from all of the evidence reflecting the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final." (*Id.* at p. 453.)

## The Date-of-separation Evidence

■ Date of separation is a factual issue to be determined by a preponderance of the evidence. (*In re Marriage of Peters* (1997) 52 Cal.App.4th 1487, 1493–1494 [61 Cal.Rptr.2d 493].) "Our review is limited to determining whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." (*In re Marriage of De Guigne* (2002) 97 Cal.App.4th 1353, 1360 [119 Cal.Rptr.2d 430].) In its statement of decision, the court expressly found there was a preponderance of evidence that "the Manfers' private conduct evidenced a final and complete break in their marital relationship in June of 2004." That factual finding is supported by substantial, essentially undisputed evidence and the court's *other* factual findings. Inter alia, the court found: Samuel moved out of the family residence in June 2004; Samuel and Maureen did not have sexual relations with one another after June 2004; they did not commingle money or support one another after that time; Maureen "had no present intent to resume the marriage" after that time; neither

---

occupying the same dwelling. In such cases, however, the evidence would need to demonstrate unambiguous, objectively ascertainable conduct amounting to a physical separation under the same roof." (*Ibid.*)

Maureen nor Samuel sought marriage counseling after that time; they lived "separate and apart" after that time; they agreed at that time "to hide the separation from their family and friends"; and they "had a parting of their ways in June 2004." Other undisputed evidence showed Samuel leased an apartment June 21, 2004, and five days later, after the couple quarreled and Maureen "concluded [the] marriage was over," Samuel moved into that apartment.[5] There is no doubt the court's factual findings regarding Maureen's subjective intent and the objective evidence of a final and complete break in the relationship are supported by substantial evidence.

Samuel relies heavily on *Baragry, supra*, 73 Cal.App.3d 444, to show the couple's rift was not final until he moved out. He notes he stayed in the family residence during the holidays, he and Maureen went on a number of trips together, they celebrated his birthday at a fancy restaurant with their children and had a family photo taken there for the Christmas cards, and they had dinner together on New Year's Eve. These facts do not equate to the *Baragry* facts, which we now recite at some length to demonstrate the point, nor do they lead to the date-of-separation conclusion reached by the *Bargary* court.

In *Baragry*, an eye physician and surgeon husband filed his petition for dissolution on October 14, 1975, and sought to fix the date of the parties' separation four years earlier, to coincide with the date he physically left the home he had shared with his wife of 20 years and began to split his time between her and his girlfriend. (*Baragry, supra*, 73 Cal.App.3d at pp. 446–447.) The following facts were undisputed: "After a quarrel with wife, husband moved out of the family residence on 4 August 1971 and stayed for a time on his boat. Thereafter he took an apartment, into which his 28-year-old girlfriend and employee, Karen Lucien, moved and in which both now live. Although not sleeping in the family residence, husband maintained

---

[5] Samuel asserts there was no evidence the parties *jointly* agreed the marriage was over or *he* perceived the rift as final. Of course, no such evidence is required under *Hardin* or other authorities if the evidence demonstrates *she* perceived the rift as final. But in any event, the evidence is undisputed that the parties agreed to keep their separation a secret until after the holidays, and this gives rise to a compelling inference the couple understood there was a separation to hide. Moreover, although Samuel protests there was no evidence Maureen disclosed her intention to end the marriage, and although he cites his own testimony as showing reconciliation remained a possibility in his mind until March 2005, we remind Samuel not only that no such evidence was required, but that we indulge all intendments in favor of the correctness of the court's factual findings. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 [275 Cal.Rptr. 797, 800 P.2d 1227] [the presumption of correctness applies where, as here, any omissions or ambiguities in the statement of decision have not been timely asserted in the court below].)

continuous and frequent contacts with his family. He ate dinner at home with wife almost every night in 1971 and 1972 and thereafter ate at home at least three to five times a week. He maintained his mailing address at the home. In 1971 and 1972, he took wife and daughters to Yosemite and San Francisco. On Christmas Eve, 1971, he slept at home. Throughout 1972 and 1973, he took his family to all UCSB basketball games. In 1973, he went with his wife to Sun Valley for a week without the children. He frequently took wife to social occasions—parties at friends' homes, dinners for professional and academic groups, outings with other doctors and their wives. He sent wife numerous Christmas, birthday, and anniversary cards throughout the years 1971 to 1975, including a card stating, 'I love you' in 1973, and an anniversary card with a huge box of flowers in September 1975. In 1974 he filed an enrollment card at their daughter's private school stating that she lived at home with both parents. The parties continued to file joint income tax returns, and husband maintained his voting registration at the home address. He paid all the household bills and supported his family. He regularly brought his laundry home to wife, who washed and ironed it twice a month." (*Id.* at p. 447.) In addition, "wife desired a reconciliation, and . . . [h]usband did not tell her he was never coming back. Husband testified he took wife on outings in order to preserve social appearances and to keep in touch with his children, who otherwise would not come to see him. He delayed filing for divorce because his 'solid mid-Western upbringing' made him reluctant to file for divorce." (*Ibid.*)

The *Baragry* court dryly observed that for four years, while husband slept with his girlfriend, he "maintained the facade of a marital relationship, but he now claims to have been legally separated from his wife." (*Baragry, supra*, 73 Cal.App.3d at pp. 447–448.) Declining to endorse husband's harsh proposition, and alluding to established law under which a wife is entitled to share in the growth and prosperity of the community property "[s]o long as [she] is contributing her special services to the marital community" (*id.* at p. 448), the court aptly stated, "At bench, husband was presumably enjoying a captain's paradise, savoring the best of two worlds, and capturing the benefits of both. Wife was furnishing all the normal wifely contributions to a marriage that husband was willing to accept and most of the services normally furnished in a 20-year-old marriage. Husband was reaping the advantages of those services and may be presumed to owe part of his professional success during that four-year period to wife's social and domestic efforts on his behalf. One who enjoys the benefit of a polygamous lifestyle must be prepared to accept its accompanying financial burdens." (*Id.* at p. 449.)

The facts in the case before us bear scant resemblance to those in *Baragry*. We need only note that here Samuel and Maureen essentially disentangled their lives in all respects, save occasional social engagements, to carry out their *mutual* agreement to keep their separation secret so as not to spoil the holidays for their daughters and friends, whereas in *Baragry*, wife, unaware of her husband's decision never to return, dutifully did his laundry and cooked his meals for four years! Enough said. To the extent Samuel argues the *Baragry* court's "appearance of marriage" comment (*Baragry, supra*, 73 Cal.App.3d at p. 449) is the central, dispositive point of the case, he seriously misapprehends the decision, as perhaps did the trial court here. The *Baragry* reviewing court reversed the trial court's premature date of separation precisely because "there [was] no sufficient evidence to rebut the presumptive status of a legal marriage continuing" until the husband filed for dissolution. (*Ibid.*)

That is clearly not the case here. None of the facts about Samuel and Maureen's activities during the live-apart period vitiates the substantial evidence supporting the court's finding "that the Manfers' *private conduct evidenced a final and complete break in their marital relationship in June of 2004.*" (Italics added.)

*The Court's Date-of-separation Legal Conclusion*

By any definition, the factual findings reiterated above support only one *legal* conclusion, that is, the date of separation occurred in June 2004.[6] Indisputably, the couple evidenced they had reached a "condition where [they had] come to a parting of the ways and [had] no present intention of resuming the marital relations and taking up life together under the same roof" (*Makeig, supra*, 112 Cal.App. at p. 143); "the parties' conduct evidence[d] a complete and final break in the marital relationship" (*Baragry, supra*, 73 Cal.App.3d at p. 448; accord, *In re Marriage of von der Nuell, supra*, 23 Cal.App.4th at p. 736); the couple began " '[l]iving separate and apart' " with "the contemporaneous conjunction of intent to separate and conduct evidencing that intent," i.e., an "objectively ascertainable form of physical separation" (*Norviel, supra*, 102 Cal.App.4th at p. 1164); and at least one of the parties did not "intend to resume the marriage *and* . . . her actions [bespoke] the finality of the marital relationship," and there remained "no reasonable possibility of eliminating, correcting or resolving [the marital] problems." (*Hardin, supra*, 38 Cal.App.4th at p. 451.)

---

[6] The court specified the month and year, but not the specific date. On remand, the court needs to pick an appropriate date as derived from the record. That *may* be, but is not necessarily, as late as the July 1, 2004, date alleged by Maureen in her response to the petition.

Despite having made a factual finding supported by the evidence, the court decided the date of separation did not occur until nine months later, when Maureen and Samuel made an after-the-fact announcement to the world that their marriage was over. In our independent review of this question of law (*Norviel, supra,* 102 Cal.App.4th at p. 1157), we conclude the court erred. The court's focus on the couple's "public persona" was misdirected. Like Samuel, the court placed an unwarranted emphasis on *Baragry*'s "appearance" language and consequently misconstrued the test. The question is not what society at large would have perceived, but what the parties' "subjective intent" was, as "objectively determined from *all of the evidence reflecting the parties' words and actions* during the disputed time." (*Hardin, supra,* 38 Cal.App.4th at pp. 452–453, italics added.)[7] The court placed a single-minded and, we think, speculative concern on how things might have looked to outsiders, without even specifying what those things were. There was no evidence at all on the issue of what an outsider might have believed, and we could as easily speculate that all of the couple's friends and family knew they were witnessing a charade when the couple interacted on social occasions and trips, but were too polite or embarrassed to bring up the subject preemptively. Moreover, there was no issue or evidence in the case as to how the couple's public conduct may have benefited them in derogation of anyone else's rights, thus the court did not have to concern itself with protecting outsiders.

■ In any event, the public-perception standard utilized by the court was in derogation of the established "subjective intent" legal standard for establishing date of separation, as set forth essentially uniformly in all of the cases discussed above. Here, the court found by a preponderance of the evidence that the marriage relationship was irretrievably over in June 2004, as shown by Maureen's subjective intent *and* specific instances of the parties' objective conduct demonstrating that intent (i.e., they physically separated, they did not have sexual relations, they did not commingle funds or support one another, they sought no counseling, and they agreed to hide their separation). In the absence of any factual findings of equivocation, ambivalence, or uncertainty, as a matter of law, the court could not defer the date of separation to coincide with the couple's public revelation of their split. The order must be reversed and the case remanded for further proceedings in accordance with the legal principles set forth in this decision.

---

[7] Samuel alludes to a footnote in *Hardin* which he infers indicates it is perfectly acceptable to ask what society at large would think to determine the date of separation. (*Hardin, supra,* 38 Cal.App.4th at p. 453, fn. 3.) We express no opinion as to the meaning intended by the *Hardin* court in its casual citation to a "respected family law authority" as the source of that test; but we do know that if an "objective" test is applied in the context suggested by Samuel, it must inquire what a reasonable person, *knowing all the facts,* would surmise, not what a clueless observer would conclude. This path of inquiry leads nowhere: Outward appearance as interpreted in the mind of the public is not the equivalent of "objective" evidence of subjective intent.

## CONCLUSION

The order is reversed. The case is remanded for further proceedings in accordance with this decision. Maureen shall recover her costs on appeal.

O'Leary, Acting P. J., and Aronson, J., concurred.