Filed 4/22/14  Marriage of O'Connell CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re the Marriage of LUZ M. and JAMES J. O'CONNELL. | |
| LUZ M. O'CONNELL, Respondent, v. JAMES J. O'CONNELL, Appellant. | G047362 (Super. Ct. No. 05D001049) O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Richard Vogl, Temporary Judge. (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed in part and reversed in part.

Law Offices of William J. Kopeny and William J. Kopeny for Appellant.

Law Offices of Kersten & Associates, William C. Kersten and Brandon R. Creel for Respondent.

This is a divorce proceeding.  Appellant James O'Connell (James) appeals from a judgment that divided certain property, determined spousal support, and awarded attorney fees and sanctions.  On appeal, James challenges the trial court's division of the family residence, its determination of the date of separation, and its imposition of sanctions.  We reverse the trial court's division of the family residence, and affirm in all other respects.

FACTS

James is an experienced electrician.  Respondent Luz O'Connell (Luz) is a house cleaner and crossing guard.  The parties married in January of 1994.  During the marriage, James handled all of the parties' finances.

That spring they purchased a home (the Salcedo property) for $187,900.  James made a down payment of $37,580 using separate property funds and took title as his sole and separate property.  Shortly thereafter, Luz signed a document entitled "Interspousal Transfer Grand Deed" purporting to grant the residence to James as his sole and separate property.  Luz signed it, but testified that James misrepresented the nature of the document, claiming it was just a form the bank needed and that the Salcedo property was in fact community property.  Luz signed it on April 11, 1994, but the document was not notarized until May 11, 1994.

In 2000, James commenced a partnership with his brother in Lake Forest Electric, a company performing electrician services.  There were no other employees, and the business operated largely in cash.

In August of 2002 the parties purchased another residence (the Boltana property), taking title as husband and wife, joint tenants.  At trial James claimed the $98,000 down payment was financed by a loan from his brother.  However, the money

2

came from a certain Mark Tage and James repaid Tage directly. The alleged loan was not documented. The court found the loan was based on the credit of the community.

Three months later, the Salcedo property (the old residence) was sold for $400,000 for a net gain of $173,300. These funds were used to repay the $98,000 loan for the down payment on the Boltana property.

In 2003 the Boltana property was refinanced and a new debt of $252,000 was created. The court found this loan was extended in reliance on community credit.

In February of 2005, Luz filed this divorce action, listing the date of separation as February 3, 2005. James was served four days later. The court found that the parties reconciled later that year (which James disputed at trial). Although no further action was taken on the petition until shortly before Luz filed an amended petition in 2010, the original petition was never dismissed.

Between 2005 and 2010, the time during which James claims the parties had separated, the parties lived together, slept in the same room, filed joint tax returns, went on family cruises together, took Christmas photos, and had "normal marital relations." They also remodeled their home, installing a new driveway, installing slate in the backyard, and remodeling two bathrooms. In 2006 James sought a California Law Enforcement Telecommunications System Restraining Order against a woman, seeking protection for both him and Luz.

Between 2005 and 2010 the parties filed tax returns reporting income ranging from $12,230 to $26,956, primarily in rental income. James reported virtually no income from his electrician business. The court found no credibility in any of these tax returns, stating: "The expense of the lifestyle of the parties was well in excess" of the reported income.

During the same period, James purchased real estate, sold stocks, and bought and sold collector vehicles, including a Ferrari and Mercedes. In one instance, he sold a car for $22,000 but agreed with the buyer to lie on the bill of sale by stating the sale price was $15,000. He also withdrew $30,000 (in three separate $10,000 withdrawals) from community accounts for his own personal expenses without telling Luz.

In April of 2010, James moved out of the family home and began to live in a mobile home. "Although [James] testified that this mobile home was owned by his brother, when his brother testified, the brother testified he never owned a mobile home!"[1]

"During 2010, [James] sold his Ford truck for $11,000, and purchased another truck (GMC) for $22,000. [James] first testified that the additional $11,000 to make the purchase was a gift of cash from his brother, but later he indicated a withdrawal from the investment accounts." During 2010 James also bought a 2003 Mercedes and took money out of community accounts without Luz's knowledge or permission, never providing an accounting of the funds. James continued to make house, car, and insurance payments for Luz.

In September of 2010 Luz filed an amended petition for dissolution of the marriage, listing the date of separation as April 23, 2010. James, in his response, continued to list the date of separation as February 3, 2005.

Shortly thereafter James "signed under penalty of perjury an income and expense declaration wherein he stated that he was a '50%' partner in the business known as Lake Forest Electric. He asserted that his income was $1,677 per month, but that his estimated personal monthly living expenses added to $3,832. [James] stated he had paid his attorney $7,500. No explanation has been given to the court of the source of the

_____

[1]     Unattributed quotes throughout this statement of facts are to the court's statement of decision.

4

attorney fees paid. Without any evidence, [James] estimated the income of [Luz] in the 'housecleaning business and as a crossing guard' at $3,700 monthly!"

The court entered a dissolution status judgment in July of 2011. Shortly thereafter, James married his girlfriend. James's new wife encountered some legal difficulties and James agreed to hold $40,000 cash to help her evade creditors. In similar fashion, James's father agreed to hold title to James's Mercedes to help him evade his obligations in this proceeding. When asked why he was holding title, James's father awkwardly explained, "I think he was having difficulties at home."

In 2011 James purchased a Mercedes Benz C 230 for the parties' daughter.

In May of 2012 the underlying trial commenced and continued over three nonconsecutive days. The parties presented direct testimony by declaration, with live cross-examination. After trial, the court issued a detailed statement of decision.

The court first found that James was not a credible witness. "In this case, the court found the testimony of [James] to be without much truth. . . . [T]he court has extremely serious doubts about the integrity of his evidence. . . . [T]he court has concluded that [James] is not a reliable witness as to financial matters, and that his overall conduct raises serious questions about his fairness and reliability with respect to the issues to be adjudicated in this matter." "It is undisputed that [James] bought and sold expensive cars and made a profit from it and that this income was not expressed in the parties' tax returns, and it is undisputed that [James] lied in the preparation of the bill of sale." "It is undisputed that [James] was the owner of several Dali paintings and owned collectable football jerseys and helmets as well as other sports memorabilia. One doesn't do this on a minimum wage. [¶] It is undisputed that [James] has consistently maintained that his income from employment is about the sum of minimum wage. The court doesn't believe him. [¶] It is undisputed that the parties maintained a comfortable standard of living, driving new vehicles, taking cruises, and having rental property. The court finds [James] did not declare on his taxes all income he actually earned. [¶] The

5

court finds that to maintain the marital standard of living, the income of [James] was an actual 'net' each month [of] about $4,600."

The court then agreed with Luz in determining the date of separation was April 23, 2010. "The court finds that after the matter was filed in 2005, the parties had a total reconciliation. They lived together, filed joint tax returns, took cruises, sent out family Christmas cards and in all manner acted as a married couple. [James] even sought to protect [Luz] when he filed for a California Law Enforcement Telecommunications System Restraining Order against another in 2006. [¶] The court finds that there was no[t] a complete and final break in the marital relationship until [James] moved out of the family home in April 2010."

The court next ruled the proceeds of the sale of the Salcedo property were community property, with the exception of the down payment of $37,850. The court reasoned that the interspousal transfer grant deed was presumptively acquired through undue influence, and that James had failed to rebut that presumption.

With respect to the current Boltana property, the court ordered that it be sold, granting James a $37,580 contribution from the down payment on the Salcedo property, and otherwise splitting it half to each party.

The court then characterized several financial accounts, totaling approximately $380,000, as well as real estate in Mississippi, as community property. With respect to these accounts, the court found "that after the parties' initial separation in 2005, [James] maintained a pattern and series of transactions where he took money from community accounts without notice to [Luz], without permission from [Luz], and without ever providing an accounting." James provided very little documentation as to these accounts. The court deemed James to be a constructive trustee, found he had violated his fiduciary duties under Family Code section 1100, and made various findings as to the

values of the accounts based on what little evidence was available.[2] The court then awarded the entirety of the reconstructed value of those accounts to James and ordered James to pay half of that amount to Luz under section 1101, subdivision (g).

The court awarded $2,000 per month to Luz in spousal support, which James does not challenge on appeal.

Finally, the court awarded $62,903 in sanctions pursuant to section 1101, subdivision (g), and $25,000 in attorney fees against James. The court stated two bases for the award: James's refusal to produce financial documents during discovery, and James's breach of fiduciary duty in withdrawing money from community accounts without Luz's consent. James "owed the highest fiduciary duties including complete disclosure of" financial information. "In this case [James] made no disclosure at any time of his financial dealings." In reference to attorney fees, the court found "that the majority of fees incurred were due to husband's refusal to make pertinent records available, to make complete and truthful property and income disclosures, to cooperate in discovery, and through generally stalling the process. The record reveals a case of stunning complexity due to husband's intransigence. The dilatory and uncooperative conduct justifies the award made. Further, is some lack of truthfulness." The court further found James "intentionally breached his fiduciary duty to [Luz] in that he regularly and consistently withdrew funds from the parties' institutional accounts. [¶] [James] invaded these accounts without notice to [Luz] for the payment of his own expenses and although he asserts that he also used these funds to support [Luz] and the child, no account has been provided by [James] as to this allegation."

The court entered a judgment on reserved issues. James timely appealed.

---

[2] All further statutory references are to the Family Code unless otherwise stated.

7

DISCUSSION

*The Court Erred in Holding That Invalidation of the Interspousal Transfer Grant Deed Rendered the Salcedo Property Community Property*

James first argues the trial court erred in holding the Salcedo property was community property because the court discussed only the interspousal transfer deed, and, finding it invalid, leaped to the conclusion that the Salcedo property was community property. James contends, however, that prior to the interspousal transfer deed, he purchased the property as his sole and separate property, as reflected on title. Thus the interspousal transfer deed was redundant, and even if invalid, the Salcedo property was James's separate property. We agree the court erred.

There are three presumptions potentially applicable in this case. Evidence Code section 662 states, "The owner of the legal title to property is presumed to be the owner of the full beneficial title. This presumption may be rebutted only by clear and convincing proof." This is the form-of-title presumption. It is well established that, where there is a conflict, the form-of-title presumption prevails over the presumption that property acquired during the marriage is community property. (*In re Marriage of Lucas* (1980) 27 Cal.3d 808, 814-815; see § 760.)[3] Section 721, subdivision (b), sets forth a third presumption. It provides, "in transactions between themselves," a husband and wife owe each other a fiduciary duty "of the highest good faith and fair dealing . . . ." This has been interpreted to mean that "when an interspousal transaction advantages one spouse over the other, a presumption of undue influence arises." (*In re Marriage of Haines* (1995) 33 Cal.App.4th 277, 287.) When the undue influence presumption conflicts with

---

[3] Some aspects of the *Lucas* opinion have been superseded by statute, including the statutes now codified as sections 2581 and 2640. But these statutes do not affect the general rule that the form-of-title presumption prevails over the general presumption that property acquired during marriage is community property. (See *In re Marriage of Brooks & Robinson* (2008) 169 Cal.App.4th 176, 186-190.)

8

the form-of-title presumption, the presumption of undue influence prevails. (*Id.* at pp. 301-302.) Thus the presumptions in order of highest priority are: the undue influence presumption, the form-of-title presumption, and the community property presumption. The court correctly applied this framework in invalidating the interspousal transfer deed.

But James's initial acquisition of the Salcedo property as his sole and separate property was a transaction between himself and the seller, not an interspousal transaction — a fact the court seems to have overlooked. As a result, the undue influence presumption does not apply to that transaction. Instead, the court should have applied the form-of-title presumption, and disregarded the community property presumption, putting the burden on Luz to prove by clear and convincing evidence that the parties owned the property jointly. Luz did testify that she and James agreed the Salcedo property would be community property. But because the court applied the incorrect legal standard, it never reached the issue of whether Luz rebutted the form-of-title presumption. Accordingly, we must reverse for a new trial on that issue.

Luz also contends that, even if James is right about the form-of-title presumption, he never traced the funds from the sale of the Salcedo property, and thus the "entire argument is moot." We disagree. While we acknowledge the dearth of evidence James provided in general as to tracing, it is clear that in awarding James a $37,580 reimbursement from the sale of the *Boltana* property, the trial court credited James's testimony tracing his down payment on the Salcedo property to the Boltana property. Indeed, the trial court explicitly stated, The Salcedo property proceeds "were used to reimburse the person who loaned the $98,000 to purchase [the Boltana property]."[4] Since

---

[4] Somewhat confusingly, in the immediately prior sentence, the court stated James "has presented no accounting of the tracing" of the funds from the sale of the Salcedo property. What we think the court meant is that the proceeds of the sale of the Salcedo property, $173,300, were adequately traced to repaying the $98,000 loan, but that there was no tracing as to the remainder of the funds.

9

James's interest in the Salcedo property may have been greater than the down payment, we must remand to calculate that interest.

We cannot determine his interest on the record before us for two reasons. First, on remand Luz may be able to overcome the form-of-title presumption, which would effectively reinstate the court's ruling. Second, even if Luz cannot do so, the record does not reveal what contributions the community made to paying down the mortgage on the Salcedo property, if any, and thus we cannot determine what percentage of the equity belonged to James versus the community. (See *In re Marriage of Marsden* (1982) 130 Cal.App.3d 426, 437.)

*The Court's Finding of the Date of Separation is Supported by Substantial Evidence*

James challenges the court's finding of the date of separation on the basis that the court did not "act reasonably" in finding the date of separation was in 2010. He then, essentially, requests that we reweigh the evidence and decide for ourselves whether the court's finding was reasonable.

"[L]egal separation requires not only a parting of the ways with no present intention of resuming marital relations, but also, more importantly, *conduct* evidencing a *complete and final break* in the marital relationship." (*In re Marriage of von der Nuell* (1994) 23 Cal.App.4th 730, 736.) "Date of separation is a factual issue to be determined by a preponderance of the evidence. [Citation.] 'Our review is limited to determining whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion.'" (*In re Marriage of Manfer* (2006) 144 Cal.App.4th 925, 930.)

The evidence supporting the court's finding was ample. After the time James claimed the parties separated, "[t]hey lived together, filed joint tax returns, took cruises, sent out family Christmas cards and in all manner acted as a married couple. [James] even sought to protect [Luz] when he filed for a California Law Enforcement

10

Telecommunications System Restraining Order against another in 2006." To that list we would add the fact that the parties remodeled their home during the alleged separation, and Luz's express testimony that the parties reconciled, slept in the same room, and had "normal marital relations" up to the point when James left in 2010.

James seems to place special importance on Luz's declaration in her 2005 petition that the parties separated in 2005. A party's recital of the separation date in a pleading is not conclusive. As one court explained, "Our conclusion that there is nothing sacrosanct about a separation date recited in a settlement agreement recognizes not only the equitable nature of the proceedings, but the idiosyncrasies of human relationships. As this case illustrates, it is not uncommon for parties to a marriage gone sour to live their lives separate and apart while maintaining some vestiges of the marital relation. Many marriages are 'on the rocks' for protracted periods of time and it may be many years before the spouses decide to formally dissolve their legal relationship. In such situations, separation dates can often be 'guesstimates' or approximations selected at random or without careful consideration." (*In re Marriage of Umphrey* (1990) 218 Cal.App.3d 647, 657, fn. 2.) Although that case involved a settlement agreement, the same principles apply to a separation date recited in a petition, especially one that was quickly abandoned.

Addressing the evidence the court relied on, James claims it is "nothing more than a misapplication of the idea of a 'public perception standard' which the trial court apparently substituted for the application of the proper legal standard which depends upon the subjective intent of the parties, and objective manifestations of the intent to separate." James then goes on to discuss various financial transactions, such as purchasing automobiles, that purportedly objectively demonstrate him acting as an unmarried individual.

James's argument lacks merit. The trial court explicitly recited that the law is *not* a public perception standard: "[I]n determining a date of separation, the trial court

11

must make a finding that the parties private conduct demonstrated a complete and final break in the marital relationship, and . . . *this finding is not a 'public perception standard,' but rather the 'subjective intent' legal standard*." (Italics added.) Beyond that, James's argument seems to be that the court should not have relied on objective evidence to infer subjective intent, relying instead only on the self-serving testimony of the parties about their intent. That is plainly wrong. The court can and should consider objective evidence bearing on the parties' intent. (*In re Marriage of Hardin* (1995) 38 Cal.App.4th 448, 453 ["The husband's and the wife's subjective intents are to be objectively determined from all of the evidence reflecting the parties' words and actions during the disputed time in order to ascertain when during that period the rift in the parties' relationship was final"].) The trial court applied the correct law and its finding is amply supported by substantial evidence.[5]

*The Court's Finding that the $98,000 Down Payment Loan Was Extended on the Basis of Community Credit is Supported by Substantial Evidence*

James contends the trial court erred in finding that the $98,000 loan, the proceeds of which were used for a down payment on the Boltana property, was extended on the basis of the credit of the community. James contends that the evidence pertinent to this issue was undisputed, and that we should thus review the issue de novo. We

---

[5] James also claims the court's finding was an abuse of discretion. We do not review factual findings for abuse of discretion. We review them under the substantial evidence standard. "'Unlike the substantial evidence rule, which measures the quantum of proof adduced in the proceedings below [citation], the abuse of discretion standard measures whether, given the established evidence, the lower court's action "falls within the permissible range of options set by the legal criteria." [Citation.] [¶] The substantial evidence rule deals with *evidentiary proof*, while the abuse of discretion standard is concerned with *legal principles*.'" (*Ramos v. Countrywide Home Loans, Inc.* (2000) 82 Cal.App.4th 615, 624.) Determining the date of separation principally involves, as in this case, examining disputed evidence to make discrete factual determinations. Accordingly, the substantial evidence standard applies.

12

disagree that the evidence was undisputed and hold the court's finding is supported by substantial evidence.

"Loan proceeds acquired during marriage are presumptively community property; however, this presumption may be overcome by showing the lender intended to rely solely upon a spouse's separate property and did in fact do so. Without satisfactory evidence of the lender's intent, the general presumption prevails." (*In re Marriage of Grinius* (1985) 166 Cal.App.3d 1179, 1187.) As a corollary, "[t]he proceeds of [a] loan . . . made on the personal credit of either spouse are regarded as community property . . . ." (*Bank of California v. Connolly* (1973) 36 Cal.App.3d 350, 375.)

According to James's brief, "James maintains that the loan was a separate property loan for the reasons stated in his testimony, including: (1) it was a loan from his brother; (2) it was repaid by James from the sale of his *separate property* residence (Salcedo); and (3) there is no evidence whatsoever as to the intent of the person who loaned the money which supports the trial court's finding in this regard." (Fn. omitted.) James maintains this evidence is undisputed, and thus argues we should review the issue de novo.

There are a number of problems with James's argument. Most importantly, the evidence is disputed, and thus de novo review is inappropriate. For example, it was unclear who the loan was from. James claimed it was from his brother. But the funds originated from a certain Mark Tage, and James paid Tage back directly. The court could easily have found that Tage was the lender, not James's brother. This is particularly true because the credibility of James's evidence was severely impeached. Not only did the court find James was a consummate liar (a finding he does not challenge on appeal), but James did not produce any evidence documenting the alleged loan. This was consistent with James's practice in discovery of failing to produce financial documents (another finding James does not challenge on appeal). As a result, the court was justified in

13

concluding James failed to present any evidence at all of the true lender's intent, much less sufficient evidence to rebut the presumption.

James also fails to mention that the loan was used to acquire *a community asset*, which further reinforces the presumption that the loan was extended on the basis of community credit.

Finally, James presented no evidence that the loan was secured by anything, much less his separate property. And as noted above, the proceeds of loans extended on the general credit of either spouse are presumptively community property.

What remains is the simple fact that James used the proceeds of the sale of the Salcedo property to repay the loan. Even assuming the Salcedo property was his separate property (an issue to be determined on remand), without any sort of lien or security interest in the Salcedo property, the mere fact that the proceeds of the sale were used to repay the loan has little bearing on the lender's intent at the time of the loan. Thus the trial court's finding that James failed to rebut the community property presumption is supported by substantial evidence.

*The Court Did Not Abuse Its Discretion in Awarding Sanctions*

In imposing sanctions in the amount of $62,903, plus $25,000 in attorney fees, the court relied on three statutes. First, it relied on section 2040, subdivision (a)(2), which creates an automatic restraining order upon the service of summons in a dissolution action that prohibits disposing of community assets without the other party's permission.[6] That restraining order went into effect upon the filing of the original

---

[6] The full text restrains "both parties from transferring, encumbering, hypothecating, concealing, or in any way disposing of any property, real or personal, whether community, quasi-community, or separate, without the written consent of the other party or an order of the court, except in the usual course of business or for the necessities of life, and requiring each party to notify the other party of any proposed extraordinary expenditures at least five business days before incurring those expenditures

14

petition in 2005. Second, the court relied on section 2100, subdivision (c), which imposes an ongoing obligation of full and accurate financial disclosures during the dissolution proceeding. Third, it relied on section 1100, which imposes fiduciary duties on a spouse who manages or controls community property. On appeal, James argues only that the court's reliance on section 2040 was misplaced. He does not challenge the court's reliance on sections 1100 and 2100, nor its findings that James consistently and intentionally violated his duty of accurate financial disclosures.

His argument against the court's reliance on the restraining order imposed pursuant to section 2040 is that the restraining orders "should not have been in effect based on the trial court's finding of a 'total reconciliation' . . . ." According to his argument, either the date of separation was in 2005 as he claims, in which case the restraining order would apply, or it was in 2010, as the court found, in which case the restraining order would not apply. This is a false dichotomy.

Section 233, subdivision (a), provides, "Upon filing the petition and issuance of the summons and upon personal service of the petition and summons on the respondent or upon waiver and acceptance of service by the respondent, the temporary restraining order under this part shall be in effect against the parties *until the final judgment is entered or the petition is dismissed, or until further order of the court*." (Italics added.) Here, the petition was filed in 2005. The fact that the parties reconciled later that year was a good reason to dismiss the original petition, and it would have provided ample grounds for the court to modify the restraining orders. But court orders do not retroactively disappear based on a finding, five years down the road, that the parties reconciled shortly after the order went into effect. Court orders are not

---

and to account to the court for all extraordinary expenditures made after service of the summons on that party." (§ 2040, subd. (a)(2).) Although James did not provide a copy of the summons in the record, he does not dispute that this order issued.

15

suggestions; they are orders; they should be taken seriously, and to the extent circumstances change warranting amendment of the orders, parties must ask for that relief, not presume it. Here, the petition was not dismissed, and James made no attempt to have the orders modified. Accordingly, James was bound by the orders and his violation of them was an adequate basis for sanctions.

James further argues that the duties imposed by the trial court that gave rise to sanctions only arise postseparation, yet the court based its sanctions on transactions that occurred between 2005 and 2010, which was preseparation. James cites *In re Marriage of Prentis-Margulis & Margulis* (2011) 198 Cal.App.4th 1252, 1258, which states, "Once a nonmanaging spouse makes a prima facie showing of the existence and value of community assets in the other spouse's control *postseparation*, the burden of proof shifts to the managing spouse to prove the proper disposition or lesser value of those assets." (Italics added.) We have no qualms with that holding, but *Prentis-Margulis* did not hold that separation is the *only* way a fiduciary duty to manage and account for finances may arise. Here, they arose by specific court order prior to separation. There was no error in enforcing those orders.[7]

Finally, we raised the issue of whether the court improperly duplicated an award under section 1101, subdivision (g), which states the remedy for a breach of fiduciary duty under section 1100 "shall include, but not be limited to, an award to the other spouse of 50 percent, or an amount equal to 50 percent, of any asset undisclosed or transferred" in breach of the fiduciary duty. The court relied on that section in awarding Luz 50 percent of the parties' various financial accounts, and then again relied on it in awarding an additional $62,903 in sanctions. We invited supplemental briefs to address

---

[7] In his argument against the sanctions award, James also mentions in passing that "the bank accounts are conflated in the Judgment." James did not provide record citations for the argument, much less provide a separate heading. We deem that argument waived. (Cal. Rules of Court, rule 8.204(a)(1)(B)-(C); *People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1325-1326.)

16

the propriety of that procedure as well as the basis for the amount of sanctions.  Having received briefs from both parties, we conclude the award was proper.  There was no error in awarding two separate monetary remedies because section 1101, subdivision (g), states the award is "not . . . limited to" an award of 50 percent of the undisclosed asset.  Fifty percent of the undisclosed assets is the minimum award under the statute, but courts are free to go further.  As to the amount, it was approximately one-sixth of the undisclosed assets, which was within the court's discretion.

## DISPOSITION

The judgment tracing the funds from the Salcedo property and dividing the Boltana property funds is reversed.  In all other respects, the judgment is affirmed.  The parties shall bear their own costs on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.

17